of America. Thank you. Mr. Proko, please proceed. Good morning, and may it please the Court, Phil Proko on behalf of GenZar. We're here today with respect to two patents that cover the first and only FDA-approved treatments for Pompe disease. Here we have two institution decisions. In the very truncated, short amount of time GenZar had to respond to those two institution decisions, it did everything the regulations required of it. It responded fully to the grounds of unpatentability as set forth in those institution decisions. At the end of the day, in the final written decisions, the Board actually agreed with GenZar. The Board recognized that the grounds of unpatentability set forth in those institution decisions were insufficient. I thought that the Board said that it was in fact making its decision on the exact ground that was instituted. Well, it's clear that they didn't make a decision on the same grounds as were instituted. You think just because they referenced another reference that that means they didn't deny on that ground? Have you ever read our anticipation law? Anticipation law, as you probably know, requires a single prior art to disclose all the claim elements. What we validated time and time again is you can use another reference to see if the first reference does in fact disclose everything. Why isn't that what they did here? You raised the question of reasonable expectation of success of the references that were the basis of the institution decision, and they used another reference to come along and show why those institution decision references would have been viewed by one of skilled in the art of having a reasonable expectation of success. It's clear that the institution decision references themselves actually could not supply the reasonable expectation of success. That's very clear because at best they reference in vitro data. And what we have is a recognition at the end of the day that in vitro data is not predictive of what happens in vivo. It's not predictive of what happens in a human patient. Did the board find that? I didn't see a fact finding to that extent, and it's my understanding that it's your obligation to prove that fact, if true. Well, the argument that was made in the Pat Nona response was the institution decision only references references that had in vitro data. The argument was twofold. One, you haven't in the institution decisions set forth a reasonable expectation of success analysis at all. Full stop. Genzyme went further to say, and in any event, if you look in detail at the references, they only have in vitro data. I don't understand. In vitro data, in many instances, can be predictive of success, even in humans, jump over the step of in vivo. In some instances, absolutely it cannot be. The patent office presented in the institution decision a conclusion that, by a preponderance, it looked as though, more likely than not, the claims would be invalidated based on these four, which included in vitro data. You raised a question about whether the in vitro data would be predictive of human success or applicability, and the patent office basically rebutted your concerns. Why? I don't understand why that changes the nature of the grounds of institution. The patent office, at the end of the day, didn't rebut our concerns. They went around them and added to the in vitro data in vivo data. No, they demonstrated that in this case, the in vitro data is predictive of in vivo data, which is predictive of human application. I don't believe there's a fact-finding that says in vitro data is predictive of in vivo results. There is simply not in the institution decision, the final written decisions, that finding. Quite the opposite. What you have in both final written decisions... Do you have any fact-finding by the PTO that says that the in vitro data is not predictive of in vitro, in vivo results? Well, that's self-evident from their analysis. At the end of the day, when they describe the scope and the content of the prior art, they bullet it out in both decisions, both final written decisions. They bullet it out, one, two, three, four. They define what is the scope and the content of the prior art. They include in vitro data, and then they include in vivo data. They don't say that in vitro data is predictive of what happens in vivo. They redefine the scope and the content of the prior art using in vivo data, and then conclude that based on that information, there's a reasonable expectation of success. Nowhere did they say that in vitro is predictive of what happens in vivo, and quite the opposite. If they believe that, there would have been no reason at all to add or rely on new references. And let's not forget, one of the new references is a 102A reference, it's the Kikuchi reference, to which Genzyme, had it been given proper notice, could have swore behind. Is my understanding correct that you didn't object to the use of the in vivo data? We actually, in our patent owner response, made it very clear that we should win because the institution decision does not set forth a reasonable expectation of success, and at best, only contains in vitro data which is insufficient. And at that point, we also said, according to the APA, according to this court's Rambis decision... Yeah, I saw that. Did you move to exclude that evidence once it was submitted? We didn't feel it was necessary to move to exclude the evidence because the case had been set forth by the patent office as it's required to do. This court's Belden decision makes it very clear. It is the PTO in the institution decisions that has to set forth the facts and the law that the patent owner has to meet. That's exactly what Genzyme did. BioMarin or any other petitioner cannot change that notice unilaterally. It is up to the agency to provide the requisite notice. And it's that notice that patent owners respond to. And once you respond, let's remember, once the patent owner puts its stake in the ground, if you will, that is your case. Your complete case has gone in at the patent owner response stage. So in this case, in the final written decisions, it's very clear that, in fact, the board agreed with Genzyme that in vitro data was insufficient. There's no other reason to have to rely on the in vivo data. They relied on in vivo data from new references, not at all mentioned in the institution decision, including, as I mentioned before, the Kikuchi reference. Now, of course, had Genzyme been given notice of that case, had Genzyme been told, this is the case you had to meet, they would have fully met that case, including swearing behind the Kikuchi reference. That's precisely why this court in the Belden decision said the patent office can't just change theories midstream without giving notice. That's why this court in Biedermann and other cases has said you have to stick with the thrust of the rejection. There's been a clear change in the theory. There's been a clear change in the thrust of the rejection here. There's no question about that. You have an institution decision that doesn't delineate at all the reasonable expectation of success, that at best relies on in vitro data, and that's Genzyme looking at the references blindly, without a case before it, saying at best you have in vitro data, and the board at the end of the day completely changing its analysis. It extracts from the references in the institution decision new facts, new rationales, and then relies on new references and new data, in vivo data, from two references not at all referred to in the institution decisions defined against Genzyme. What, if any, use would you say under your theory of the case that the board could, not just in this case, but in general, what new references could the board rely on in the course of the trial, and for what purposes? As long as the, this court has already set out a flexible test that we can apply, and that is has the thrust of the rejection changed? So to the extent you rely on a new reference or new information or new arguments, as long as you haven't changed the thrust of that rejection, as long as you haven't changed your theory of the case, it's okay. But when you have a situation where you don't discuss reasonable expectation of success at all, let alone the importance of in vivo data, and then in the final written decision define the scope and the content of the prior art, and you bullet it out, and you include in vivo data, including a 102A reference that could have been sworn behind, that's clearly changing the thrust of the rejection. It's clearly changing the theory of the case. What about a case in which the patent owner comes in with a defense or an assertion of fact or law that goes beyond, in the sense of raising a new issue that wasn't anticipated in the institution decision, doesn't that give the board an authority to bring in more material to respond? I guess it would be a very fact-dependent analysis, but to that I would say this. If you have a situation such as the case before you today, where you do not set, where the board doesn't set forth a prima facie case of obviousness in its institution decisions. It didn't do that. It didn't do that because it didn't even discuss reasonable expectation of success. When the patent owner raises that issue, if indeed the board hasn't raised a prima facie case, the patent owner should, in that case, prevail. Now, to the extent the board recognizes there's an error, there's an opportunity to say, yes, I'll give you notice, and you have a full opportunity to respond. If that's what the board did, we wouldn't be here. But you have to give the patent owner that full and fair opportunity to respond to whatever it is the board wants to explore at the end of the day. Now, the opposite extreme is, if the patent owner raises an issue, and that issue isn't important to the ultimate conclusion, the board can simply ignore it. You move forward and you say, that doesn't affect our analysis. Do you want to reserve the remainder of your time for rebuttals? Sure, Your Honor. Okay. Mr. Murphy? I'd like to talk about what this case is really all about. And in this case, the board is trying to institute an inter-parties review proceeding against two patents on certain grounds. And I guess one of the issues is, what is the ground? And the institution decision identified the grounds for the 410 patent, for example, as ground one was claim one is obvious over, or I'll just read it directly. Ground one, claim one under 35 U.S.C. 103 is obvious over the combination of the Duke Press release 1997, comma, Barton and Vanderplug. And then ground two, claim one under 35 U.S.C. 103 is obvious over the combination of Racer, Barton, and Vanderplug, Joint Appendix A-164 and Joint Appendix 167. The final written decisions for this patent, and we have a parallel rulings in the other patent, broke out those same two grounds in their final written opinion. Joint Appendix A-11 through 18 for ground one, Joint Appendix A-18 to 21 for ground two. Getting to the notice issue under the APA, and it's guided mainly by the APA and also by case law, the notice of the grounds comes from the board. The board didn't vary from the grounds. The grounds remain the same from the institution decisions to the final written decision. In addition to the grounds, the formal grounds, quote grounds, there's also issues, quote issues and facts that arise during a trial. Both parties, there's certain issues that the board is always going to look at. Reasonable expectation of success would be one, state of the art. There's certain things under KSR. There's just certain things you always look at in an obviousness analysis. If in an obviousness analysis it was the case that after the institution decision the board realized that one of the elements was actually missing from the references. In which case? If it was the case that the board realized that one of the elements of the claim was actually not in any of the pieces of prior art that were argued to render it obvious, is it your argument that the board would be permitted then in its final decision, and say the patentee pointed this out in its response, is it your argument that the board would be permitted to add a reference to the ground to supply the missing element? I think that there's case law that suggests they would not be able to do that in certain circumstances. Without notice, right? Without notice. Well, sure, if they gave notice, sure. If they gave notice they could do that. If they didn't give notice, I'm sorry. And an opportunity to respond. Right, right. Yes. So your argument isn't that the board is free to add additional references even if those references were somewhere in your petition, but not the basis upon which your petition grounds, not the basis upon which grounds were granted. Just the fact that those references may appear in other grounds that you allege, which the board denied, that still wouldn't make it sufficient for the board to pull one of those in for a missing element to be supplied. In this case, I think... I don't want to know about this case. I want to know about my case that I just told you about. If they were pulling in for a missing element, they would have to give the other party notice. And an opportunity to respond. Yes. Notice, opportunity to respond. Because otherwise it's a different grounds. Yes, I think you could argue that. Okay, but you think this is sufficiently different from that because in this case the board is only trying to explain what these four references actually teach one of skill in the art at that time in the field. Yes, that's exactly our position, yes. I would like to talk about the Belden case that was cited in the reply. We didn't actually... We had already filed a gun law in filing by that time. I'll just pull it out here. The Belden case at 1080 indicates that for formal adjudications, the Administrative Procedure Act requires the PTO to give certain notice. And, and this is a sentence that was quoted by Genzyme, but if you read the rest of the It permits a party to submit rebuttal evidence and to conduct such cross-examination as may be required for a full and true disclosure of the facts. So, the Administrative Procedure Act allows BioMarin to respond to any issues raised during the proceeding and to submit rebuttal evidence. The essential question is whether Genzyme had a full and fair opportunity to respond to the issue of reasonable expectation of success. Genzyme interjected or raised that issue in its patent owner response. And they came at it from all different angles. In addition to Genzyme raising it in their patent owner response, we've cited in our brief the pages where they dealt with reasonable expectation of success. Our witness, Dr. Pastores, covered that in great detail in his brief. And that's those citations are, I mean, in his declaration. And we covered reasonable expectation of success in great detail in our petition. So, this was not a surprising issue. You can't make an issue go away by ignoring it. I think what Genzyme is trying to do is, we have a case we raised reasonable expectation of success in our petition. We talked about in vivo data. We talked about in vitro data. Our witness testified from the state of the art a year before the filing date. And then he confirmed his opinion that it would be the same right before the filing date when he discussed those intervening references. Genzyme chose to go with the date of December 1998 as the date to have their witnesses testify from. So, both parties submitted testimony as to the state of the art as of December 1998. So, it's hard to understand how you can say that this is the critical date and that the prior art has to be viewed from, if it's our position, and there's case law that, I'll direct the board's attention to custom accessories, that it is presumed that an inventor has knowledge of all relevant art. So, the grounds have all the elements. The grounds have motivation. And we took a position that it was a reasonable expectation of success. Genzyme said there's no expectation of success. That was fully litigated. They raised it, we raised it, everybody argued it. And the board found that the grounds that were instituted, there was a reasonable expectation of success. They found that once in the institution decision, and they found it again in the final written decision. And in the final written decision, they relied primarily on the references in the ground. And then they, by the way, there's this other prior art that also shows there's a reasonable expectation of success. I didn't see anywhere where the board made a fact finding that in vitro data in this case is not predictive of in vivo results or anything like that. Was there a determination either way on this? There was no express finding that, I'm not aware either, where the board said in vivo is predictive by itself. But you have to, but I think it's certainly implicit. You mean in vitro? In vitro, I'm sorry. In vitro is predictive. I don't think you can find a quote where they said in vitro is predictive, where it's not predictive by itself. But it's implicit that since we're looking at the state of the art from December 1998, according to both parties, you look at the in vitro data, and then you also look, what's the state of the art at the time? And the state of the art, there was all kinds of prior art talking about that this was likely to get to, likely to be successful therapy. And I can pull out the Duke press release, for example, and there's a quote, I'll just quote it. That's okay, we have it. Anyhow, it was likely to be skeletal muscles. That's one of the references in the grounds. It's only a two-page document. That was a press release. There's also other prior art, and we discussed that in our briefs, that people were excited, people thought this was going to work. Now, nobody could predict for sure that it was going to work. So the board properly found all you need is a reasonable expectation of success. You don't need a guarantee, you don't need to run clinical trials. All you need is a reasonable expectation of success. That's based on everything in the art, including the grounds of invalidation. Okay, thank you. Oh, do you have anything further? You seemed like you were concluding. I've concluded. Very good. Okay, thank you. Mr. Hickman. Good morning, may it please the Court. I have nothing further to add this morning. I would simply echo the arguments that BioMarin made, unless there are particular questions. So do you agree with BioMarin's response to my hypothetical, which is if rather than simply proving what these references do in fact disclose, if the PTO was seeking to add a reference in order to provide a missing element, that that would constitute a new ground, and it wouldn't be appropriate for the board to do that without notice and comment? Well, I agree that notice and comment would be necessary to ensure that the patent owner is apprised as to what the element is, and to provide the patent owner with an opportunity to address it. I would disagree that it would be a new ground in the sense... I disagree that the new grounds of rejection doctrine would apply to the IPR context. So you mean all of the case law from the board, even in the MPEP, which discusses when something constitutes a new ground of rejection if made by the board for the first time in a normal prosecution outside of IPR context, that that constitutes a new grounds of rejection, which it clearly would under the board's own law and the PTO's own procedure, adding a new reference for the purpose of supplying a missing element has always been recognized as constituting a new ground of rejection by the board itself, as well as by this court, and it requires notice, I said notice and comment, but I meant notice and opportunity to be heard. You're saying that's not applicable here? I guess I misunderstood your last comment. Well, I guess let me try to illustrate. In your Honor's hypothetical, I agree that the board would be required probably to issue something that would, probably some sort of order coming from the board that actually notifies the parties as to what this new reference, this core reference part of the combination that's now in play. Basically, to clarify what the board's institution decision was. I think why I say the new grounds cases from the examination context would not directly apply is because we don't have an examiner involved, we don't have the rejection and response format, and so the way, there are many different permutations throughout an IPR trial as to how a new issue that might require notice might come up, and how the board might satisfy it. And so, for instance, if there were something that, if a patent owner were to raise in the patent owner's response, that showed the board that it should actually reconsider what the grounds are that are under consideration during trial. I wouldn't rule out the possibility that the board, even at a later stage, could still provide adequate notice, and still provide the patent owner a fair opportunity to respond. It could happen by issuing an order. It could, I wouldn't rule out that it could, I wouldn't rule out that it couldn't happen at an oral hearing, it would depend on sort of what happened through the course of discovery, and through the briefing. So, my answer is that yes, that notice and an opportunity to respond would be required, but there are different ways that that could be satisfied. Does it, if I could just ask one further question, does it strike you as clear that there's a sharp line dividing references that would be deemed to be new references for purposes of invalidation, versus references relied on as providing evidence of the state of the art? My instinct is that there's some significant risk of slop over between the two, but I wonder if the PTO has a position on that. I think typically it's pretty clear, because the board's practice is, in the institution decisions, is to actually set forth the combinations, the grounds of unpatentability that are going to proceed to trial, and the combination of those references that make up the grounds. And as here, there are many other references that were cited to prove the state of the art. Right, but suppose one of those references where they were offered to prove the state of the art was a particularly telling reference, which was actually stronger in the sense that it gave the board more comfort with the ultimate outcome in the case, than one of the cited references. Does that then become something other than merely a reference to tell you what the state of the art is? Because, of course, all references tell you what the state of the art is, because they're all prior art. And it is quite possible that it's plausible that it could, as trial goes on, that it becomes apparent that that reference is even more important. And it's also possible that the parties would have clear notice of that because of the way the litigation develops. And so, yes, notice and an opportunity to respond would be required. Could the board do it? Yes. But would the board have to do it every time? I don't think so. And I think as Judge Bryson has said. Thank you. All right. Thank you. Mr. Hickman. Thank you. Mr. Pruko. It's rebuttal time. Your Honors, I'd like to step back for a minute and think about how this process works. The PTO gets a petition. And pursuant to 314 sub A of the Patent Act, there's a threshold requirement. The threshold requirement can only be answered by the PTO. That's sub B. And sub C says they issue a decision. And that decision is issued by the PTO. That's the institution decision. 557 sub C, sub 3 of the APA says for every decision rendered by an agency, everyone, that would include this institution decision, you have to set forth your reasons, your reasons why that threshold requirement is met. And all, not some subset. The statutory provision doesn't talk about subset, skeleton, ideas. It says all. All facts and all law that are relevant. So to the extent there is an in vivo reference that's necessary to interpret in vitro data, that's material. That's clearly material. And it's clearly mandated by the APA that it be set forth in that institution decision. And that just makes sense. The patent owner shouldn't be left to guess what is material in terms of interpreting whatever it is that is in the grounds. The APA demands, demands notice of all the facts and all the law. If at that point in the litigation, you're seeing the reference morphing from one that informs in the field in the art to one that's going to command, be the primary reference, why don't you object at that time? Why don't you move to exclude that evidence and say, board, you're morphing this reference now from one that informs in the field in the art to something else? Your Honor, that's because you don't know that they're actually going to take that path. And we weren't told that they were going to take that path until the final written decisions. Here, we're given notice of the case as they were supposed to give us notice. No other notice was provided by the board. They didn't say you have to deal with any other case. They said deal with our institution decisions. We did that. It's clear what is in the institution decisions are insufficient for the purposes of finding on patentability here. And Judge Bryson, to your earlier point, can the board respond to Genzyme without it being a new ground? Well, if we look at this court's Biedermann decision, a new ground of rejection is not negated by the fact that the board is responding to an appellant's argument. Full stop. You have to give notice. And you have to give a full and fair opportunity for the patent owner here to respond. Well, that's a little different from saying that any time the board responds, excuse me, to the patent owner's argument that it is a new ground of rejection. That's just that you can't have a new ground of rejection simply by virtue of the fact. True. And again, that goes back to the thrust of the rejection. Has it changed? Has it fundamentally changed? As it has here. We moved from no reasonable expectation of success analysis to extracting new facts from the same references, which Biedermann considered to be new grounds. And then the board went beyond just extracting new facts from the same references. They added references not discussed in the institution decisions at all, including a one-on-two-way reference providing Genzyme with absolutely no notice and absolutely no opportunity to respond, including swearing behind that reference. And that's the Kikuchi reference. Okay. Thank you, Mr. Brigo. The case is taken under submission. Thank you, Your Honor.